# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JACKIE MARTINEZ, Personal
Representative, On Behalf of the Estate
of RUSSELL MARTINEZ,

    Plaintiff,

vs.    NO: 14-cv-00534 KG/WPL

JOSEPH SALAZAR, et al.,

    Defendants.

DEPOSITION OF FRANCISCO GALVAN
June 3, 2016
11:00 a.m.
119 East Marcy Street
Suite 110
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. TODD COBERLY
    Attorney for Plaintiff

REPORTED BY: Mary Abernathy Seal, RDR, CRR, NM CCR 69
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, Northwest, Suite 1630
    Albuquerque, New Mexico 87102

(5659L) MAS

Page 2

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3     MR. TODD COBERLY
       COBERLY & MARTINEZ, LLLP
 4     1322 Paseo de Peralta
       Santa Fe, New Mexico 87501-4325
 5     (505) 989-1029
       todd@coberlymartinez.com
 6
 7   For the Defendants:
 8     MR. MARTIN ESQUIVEL
       BASHAM & BASHAM, P.C.
 9     2205 Miguel Chavez Road, Suite A
       Santa Fe, New Mexico 87505
10     (505) 988-4575
       mesquivel@bbpcnm.com
11
12              I N D E X
13   EXAMINATION OF FRANCISCO GALVAN
14   Examination by Mr. Coberly            4
15   Examination by Mr. Esquivel          37
16   Further Examination by Mr. Coberly   42
17   REPORTER'S CERTIFICATE               52
18   WITNESS SIGNATURE/CORRECTION PAGE    54
19        EXHIBITS MARKED OR IDENTIFIED
20   Exhibit 1   Notice to take 30(B)(6) deposition   6
                 of the City of Espanola
21
     Exhibit 2   August 6, 2012, letter              10
22
     Exhibit 3   Personnel action form, Joseph A.    27
23               Salazar, Jr.
24   Exhibit 4   September 13, 2012, memorandum     33
25
```

Page 3

```
 1   Exhibit 5   Personnel action form, Joseph A.    33
                 Salazar, Jr.
 2
     Exhibit 6   September 24, 2013, letter          36
 3
     Exhibit 7   Receipt for property or evidence    38
 4               with attached photographs
 5
 ...
```

Page 4

```
 1              FRANCISCO GALVAN,
 2   after having been first duly sworn under oath,
 3   was questioned, and testified as follows:
 4              EXAMINATION
 5   BY MR. COBERLY:
 6     Q   Good afternoon.
 7     A   Good afternoon.
 8     Q   Can you state your name?
 9     A   Francisco Galvan.
10     Q   Mr. Galvan, have you ever had your
11   deposition taken before?
12     A   No, sir.
13     Q   I'm sure Mr. Esquibel has told you that I
14   need you to answer out loud instead of nodding.  No
15   uh-huhs or huh-uhs, so the court reporter can get
16   it.
17     A   Sure.
18     Q   If you need to take a break, we can take a
19   break whenever you need to.  I just ask that if
20   there's a question pending, go ahead and answer the
21   question before we take a break.
22     A   I understand.
23     Q   What is your job title currently?
24     A   Records supervisor, evidence custodian.
25     Q   Okay.  And who do you work for?
```

Page 5

```
 1     A   The City of Espanola Department of Public
 2   Safety.
 3     Q   Is the Espanola Police Department a
 4   separate entity than the Department of Public
 5   Safety?
 6     A   No, sir.  It's the Department of Public
 7   Safety with director Richard Gallegos.  Underneath
 8   him is the police department and the fire
 9   department.
10     Q   One other rule is to try to talk a little
11   slow for the court reporter.
12     A   Okay.
13     Q   I tend to do that myself.
14     A   Sorry about that.
15     Q   And how long have you held that job as
16   records supervisor?
17     A   My entire tenure.  I was hired in April of
18   2009.  I didn't take on the title of evidence
19   custodian until, I believe, February 2012.
20     Q   What are the job duties for being a
21   records supervisor?
22     A   I am the custodian on behalf of the City
23   of Espanola Police Department.  As far as responding
24   to information on Public Records Act requests, I
25   manage the front office where I have two records
```

Page 6

1  clerks that are under me.  They take the phone
2  calls, nonemergency phone calls to the police
3  department.  They sell the reports, they respond to
4  records requests.  I answer on behalf of the police
5  department for motion of discoveries, serve notice
6  of trials, grand jury subpoenas, draw up the
7  officers, kind of a liaison between the department
8  and the local magistrate courts, district attorney's
9  office.  Every morning I file the criminal
10 complaints on behalf of the department at the local
11 respective offices.  Maintain the paperwork,
12 basically, I guess.
13     Q   Okay.  Let's mark this as Exhibit 1.
14         (Exhibit 1 marked.)
15     Q   Sir, I just handed you Exhibit 1, which is
16 a notice to take a 30(B)(6) deposition of the City
17 of Espanola.  Have you seen this document before?
18     A   Yes, sir.
19     Q   Okay.  When did you first see that
20 document?
21     A   I don't have the exact date, but I'd say a
22 couple weeks, if that's an appropriate answer.
23     Q   Okay.  So do you understand that your
24 testimony here today is as a representative of the
25 City of Espanola --

Page 7

1     A   Yes.
2     Q   -- and not in your personal capacity as a
3  records supervisor?
4     A   Yes, sir.
5     Q   Okay.  And have you reviewed the topics of
6  the deposition in this notice?
7     A   I have.
8     Q   So when I refer to "you," I will be
9  referring to the City of Espanola, i.e., and the
10 Department of Public Safety --
11    A   As a whole.
12    Q   -- unless I explicitly state otherwise.
13 And if you get confused if I'm asking you in your
14 personal capacity versus the City of Espanola, let
15 me know.
16    A   Okay.
17    Q   Just generally why don't you tell me what
18 you personally did to prepare for this deposition
19 today.
20    A   Okay.  So I began by -- it seems to me
21 like the main topic was a letter sent to the City of
22 Espanola on August 6, 2012.  So to prepare for this,
23 I researched -- it's called a jacket.  It's a file
24 of every defendant that would come across -- or
25 victim, I guess.  Just everybody that the police

Page 8

1  department comes across, they have a file that it's
2  put into and it's referred to as a jacket.
3         So I started by pulling the jacket of
4  Mr. Russell Martinez to see what documents I had in
5  there, looking for this August 12 -- August 2nd
6  letter.  So I started there.  I did not find
7  anything there.  At that point I went to the
8  evidence room to see if I had anything tagged into
9  evidence under this case number.  I did come across
10 that.
11        Later on, more recently, to prepare for
12 this, I reached out to City Hall, I spoke with
13 multiple people there.  Do you want me to say who I
14 spoke to, what they did?
15    Q   Sure.
16    A   Okay.  I started off with -- her name is
17 Anna Squires.  She's currently the city clerk for
18 the City of Espanola.  I started off with her.  I
19 reached out to her to see if she had any record of
20 receiving this tort claim August letter.  I started
21 with her.  I spoke with Theresa Aguilar.  She's the
22 deputy city clerk.  She researched her records
23 management system known as LaserFiche.  And I
24 reached out to our human resources director, Sally
25 Baxter, who was a deputy clerk for the City after

Page 9

1  this, after this time, I believe, to kind of get an
2  idea of what their -- what they do in the event when
3  they receive a tort claim notice, what the process
4  is, what they do with them, where they go, and
5  whatnot, to learn their process down there.
6         So what I learned was this August -- this
7  tort claim notice -- I have copies here -- this tort
8  claim notice dated August 6, 2012, was received to
9  Ellis A. Lucero's fax on August 6, 2012, at 1800
10 hours.  We don't have an exact -- we don't know who
11 it was that received it originally.  It doesn't
12 document any of that.  We do show that three days
13 later -- let me refer to my notes here, if I wrote
14 it down.  We show three days later it was scanned
15 into LaserFiche, August 9, 2012, at 3:22 p.m.  So a
16 few days later after we received it, it was scanned
17 in and put into LaserFiche.  This is all we have in
18 regard to this down at City Hall.
19        I asked Anna Squires, you know, "Today,
20 how is it done?"
21        She goes, "Well, if I receive this notice
22 of Tort Claims Act," she goes, "I would get it over
23 to our insurance, and then I would" -- how did she
24 say it -- "we would communicate with the city
25 manager and see if our attorneys need a copy of it

Page 10

1 at that point. Not always do they go to the
2 attorneys immediately, but they always go to the
3 insurance immediately."
4     And then I asked, like, "Well, so the
5 demand for preservation of evidence" -- so when I
6 said, like, so -- because we were talking about this
7 document as a whole, I said, "and if it included the
8 demand for preservation, what would you do at that
9 point?"
10    She goes, "Well, we would internally get
11 them" -- how did she say -- "disperse it
12 internally."
13    Q   Okay. Let me stop you there to make sure
14 we got the record here. I'll go ahead and mark
15 Exhibit 2.
16    (Exhibit 2 marked.)
17    Q   I'll put that in front of you. So when
18 you refer to this document or this letter, the tort
19 claims notice, is it fair to say that you're
20 referring to document Exhibit 2?
21    A   Yes, sir.
22    Q   Okay. So what is LaserFiche?
23    A   It's a records management system. Digital
24 file cabinet, I guess.
25    Q   Was the City using LaserFiche on August 6,

Page 11

1 2012?
2    A   Yes.
3    Q   Okay. Because my understanding is this
4 letter was put into LaserFiche on August 9, 2012.
5    A   Right.
6    Q   Okay. What sort of documents other than
7 tort claims notices are put into LaserFiche?
8    A   Should I continue what I did to prepare
9 for the deposition to finish answering the previous
10 question?
11    Q   Sure, let's do that and then we can go
12 back.
13    A   Okay, I'm sorry. So after I spoke with
14 Theresa and figured out their internal process, I
15 reached out to -- because we didn't have any -- we
16 couldn't find -- we couldn't show that this left the
17 city clerk's office. So I reached out to a company
18 called IT Connect, who the City of Espanola
19 contracts to do our IT work. His name is Ishmael.
20 I don't have his last name. I apologize. So I
21 called him, or I e-mailed -- I have to go through
22 the city clerk's office to request their help. So I
23 e-mailed Theresa. Theresa forwarded it to Ishmael
24 and cc'd me, and asked him, you know, look at the
25 current -- at the time it was Tessa Jo Mascarenas --

Page 12

1 she was the city clerk -- that should have received
2 this at that time. So I asked him to reach out and
3 look at her e-mails, to see if he can see where this
4 August 6 letter went.
5     He called me this morning actually on the
6 way over here and he did not find any outgoing
7 e-mails to the City of Espanola Police Department
8 extension or to any of the officers, myself, any
9 outgoing e-mails related to Coberly Law Office,
10 related to Russell Martinez, related to Joseph
11 Salazar, related to Greg Esparza, myself, Francisco.
12 So we did not find that this letter left -- we
13 couldn't prove that this letter left anywhere from
14 Tessa's possession other than being scanned into
15 LaserFiche. So that's kind of what I have done so
16 far to prepare for this.
17    Q   Okay.
18    A   Sorry about that.
19    Q   No, I appreciate that. And I want to make
20 sure I understand. I'll probably bounce around a
21 little bit. You're throwing out a lot of names.
22 The IT person, Ishmael -- that was a contractor?
23    A   Yeah, his company is IT Connect.
24    Q   Okay. And what does IT Connect do for the
25 City of Espanola?

Page 13

1    A   They handle our IT work. The individual
2 that the City had hired there is no longer and they
3 haven't filled his position, so they reached out to
4 a third-party company to do our IT work.
5    Q   What sort of documents besides tort claims
6 notices are put into LaserFiche?
7    A   To my understanding, all documents that
8 come across. I mean, starting from the city clerk's
9 office all the way through finance, personnel
10 records, time sheets. To my understand, it's like
11 everything.
12    Q   So it's basically the City's filing
13 cabinet?
14    A   Basically, yes.
15    Q   Electronic?
16    A   And recently -- and also the City of
17 Espanola -- the police department recently got our
18 license for LaserFiche also, and although we did
19 have LaserFiche back in 2012, it wasn't being used
20 to its fullest potential. So like down at the
21 basement we have a lot of hard-copy records on file,
22 and that's another thing I should have mentioned.
23 Theresa Aguilar, the deputy clerk, also went down to
24 the basement to physically look for the Coberly Law
25 Office file and see if there was anything else on

Page 30

1           MR. ESQUIVEL: Object to the form of the
2    question.
3       Q   Is that correct?
4       A   I did not receive this, if that's what --
5       Q   I'm talking about the City.
6       A   The City, yes. So yes, it was given to
7    the city clerk. From there it was -- yes, at the
8    very least, scanned a couple of days later and put
9    into the document system, yes.
10      Q   So someone at the City --
11      A   Received it.
12      Q   -- received the letter, someone at the
13   City read the letter; is that correct?
14      A   Correct.
15      Q   And that person that the City does not
16   know who it was; right --
17      A   Right.
18      Q   -- they scanned it and put it into
19   LaserFiche.
20      A   Yes.
21      Q   And the City does not know what happened
22   with the actual physical piece of paper.
23      A   Yes.
24      Q   And the City did not notify anybody at the
25   Espanola Police Department about this letter.

Page 31

1       A   Yes.
2       Q   The City did not issue any type of
3    directive to anybody within the City or any of its
4    departments that it needed to preserve evidence.
5       A   Based off this letter? No.
6       Q   Well, based off that letter or not based
7    off that letter, about this incident.
8       A   The evidence about -- the evidence in
9    regard to this incident has been preserved and been
10   in the same bin since the day it was tagged in. It
11   has not --
12      Q   My question was: The City, after
13   receiving this letter, you agree with me that it was
14   on notice that a lawsuit was pending?
15      A   I agree with you that an individual at the
16   City was aware a lawsuit was pending when they
17   received this letter. Yes.
18      Q   And that individual at the City worked for
19   the City; right?
20      A   Correct, yes. An individual at the City
21   was aware of this lawsuit.
22      Q   And my question is: The City, in response
23   to that, did not issue any directives, written or
24   verbal, to anybody at the Espanola Police Department
25   to preserve any evidence.

Page 32

1       A   I'm not aware of any were done. I did not
2    receive any.
3       Q   And you're talking "I" as in Espanola
4    Police Department?
5       A   I, yes, because it would have come through
6    my desk, something to this effect would have come
7    through me.
8       Q   And in preparing for this deposition, you
9    never saw any document or any evidence that the City
10   put out what's called a litigation hold?
11      A   No.
12      Q   You understand the term "litigation hold"?
13      A   No. What do you mean by that?
14      Q   When I refer to litigation hold, I mean a
15   letter or directive to employees of the City that
16   there's a pending lawsuit and that you need to not
17   destroy any evidence related to that lawsuit or you
18   need to preserve evidence related to that incident.
19      A   So your question was, did we receive it?
20      Q   My question is, the City -- as far as you
21   know, the City did not issue any type of litigation
22   hold?
23      A   Right, as far as I know.
24      Q   And the City, at the time it received this
25   tort claims notice, Officer Salazar was still

Page 33

1    employed by the City of Espanola as a police
2    officer; correct?
3       A   I do not have the date of when Officer
4    Salazar left.
5           (Exhibit 4 marked.)
6       Q   I'll hand you Exhibit 4 and actually, I'll
7    go ahead and give you Exhibit 5.
8           (Exhibit 5 marked.)
9       Q   Taking a look at Exhibit 4, which is a
10   letter from Joseph Salazar, and Exhibit 5, which is
11   the City's personnel action form, would you agree
12   with me that Joseph Salazar left the police force in
13   September of 2012?
14      A   Yes, sir.
15      Q   And so going back, when the City received
16   the tort claims notice on August 6, 2012, Officer
17   Salazar was still employed by the City as a police
18   officer?
19      A   Yes.
20      Q   And when it was put into the LaserFiche,
21   when the documents were put into LaserFiche, Officer
22   Salazar was still employed by the City as a police
23   officer?
24          MR. ESQUIVEL: Object to the form of the
25   question.

Page 42

1  when I reached out from Taser, they're not -- they
2  don't possess the knowledge -- the Taser cannot tell
3  the difference between a drive stun, between it
4  being deployed or it being just a test run. It will
5  all look the same on the PDF form that we get for
6  that.
7      MR. ESQUIVEL: No further questions.
8      FURTHER EXAMINATION
9  BY MR. COBERLY:
10   Q  Mr. Galvan, let me follow up on some of
11 that. Let me see Exhibit 7 there. Exhibit 6, the
12 tort claims letter, I'll refer you to that. That
13 was September 2013; right?
14   A  No, sir. Exhibit 6 is the information in
15 the Public Records Act.
16   Q  Right. That was dated in September of
17 2013; correct?
18   A  Oh, I'm sorry, you said tort --
19   Q  I'm sorry. I'm sorry. The inspection of
20 public records request was received by the City
21 September 25, 2013.
22   A  Yes.
23   Q  Okay. At that date, the Espanola Police
24 Department did not know the serial number of the
25 Taser that had been issued to defendant Salazar;

Page 43

1  right?
2    A  On September 25, the City did not know the
3  Taser serial number?
4    Q  Right.
5    A  Let me refer to -- I'm going to have to
6  say no.
7    Q  Right. Because it's true that the City
8  doesn't have any idea --
9    A  The documents.
10   Q  -- of the serial number of the Taser that
11 was issued to Joseph Salazar; right?
12   A  Right.
13   Q  Either when he was hired or when he
14 resigned; right?
15   A  Right.
16   Q  And the data that's stored on the Taser
17 will show when the Taser was used; correct?
18   A  It will show when the Taser -- trigger is
19 activated.
20   Q  Okay. And that's for either testing the
21 battery; right --
22   A  Testing the battery.
23   Q  -- drive stun --
24   A  Drive stun.
25   Q  -- or actually --

Page 44

1    A  Deployment.
2    Q  -- deploying the Tasers?
3    A  Yes.
4    Q  I want to make sure I understand. When
5  you say deploy, you're talking about projecting the
6  barbs.
7    A  The prongs. Yes, sir.
8    Q  The prongs. Okay. But drive-stunning
9  somebody, making direct contact with that person,
10 how do you term that?
11   A  When you activate the trigger, it will --
12 when you activate the trigger to a certain level,
13 it's just the drive stun, the drive stun mode, and
14 it gets the voltage at the tip of the Taser gun and
15 you make contact with skin or with an individual to
16 use it as a defense mechanism.
17   Q  And the electronic data stored in the
18 Taser will show how many seconds the trigger was
19 activated; correct?
20   A  Yes. It turns off automatically. Like,
21 you can't just deploy the trigger and just sit there
22 forever and ever and ever. It will turn off and,
23 you know what I mean, you have to force -- you know,
24 you're forced to use it again. It doesn't keep
25 rolling.

Page 45

1    Q  It will turn off after approximately five
2  seconds?
3    A  My understanding, yes.
4    Q  And then if you want to -- if you want to
5  reactivate it, you have to depress the trigger
6  again?
7    A  Correct.
8    Q  But the electronic data stored in the
9  Taser will record all that.
10   A  It will record when the trigger is
11 activated.
12   Q  Okay. And you said Joseph Salazar was at
13 fault for not submitting a Taser use report for the
14 incident involving Russell Martinez; is that
15 correct?
16   A  That's correct. I did not locate one in
17 the jacket or the file. I could only assume he did
18 not complete it. And if he did, he didn't turn it
19 in with his report.
20   Q  And you have been involved in this
21 litigation in gathering records for production;
22 correct?
23   A  Correct.
24   Q  And you have never come across any Taser
25 use reports authored by defendant Salazar; correct?

Page 46

1    A   That's correct. It was my understanding
2    that he was aware that you have to do it when it's
3    deployed, but the policy states he should have done
4    it regardless.
5        Q   And so you agree that defendant Salazar
6    did not follow the policy.
7        A   In regards to the Taser use report, yes.
8        Q   And you would agree that if we knew the
9    serial number of defendant Salazar, the Taser that
10   had been issued to defendant Salazar, we could
11   determine how many times he deployed the Taser on
12   May 11, 2012, or how many times he pulled the
13   trigger -- activated the trigger?
14       A   Well, if we were able to download the
15   data, we should be able to find out how many times
16   it was activated. We do have -- we do have a few
17   Tasers that failed, or whatever, according to the
18   Taser, the company, because we could very well have
19   his Taser there; we just can't download anything.
20   It's just that it's broken or something failed
21   within the Taser itself that didn't allow us to
22   download any of the data. We have never -- all our
23   Tasers, whether they're broken or still used, are
24   all within our same cabinet. We still have every
25   Taser in there.

Page 47

1        Q   So defendant Salazar's Taser is in the
2    cabinet; you just don't know which Taser it is?
3        A   Yes. Yes. We downloaded every Taser X26
4    that we have in our department and provided those to
5    Basham. And there was -- I believe I gave them a
6    list of a few that did not allow us to -- and screen
7    shots and everything, what the computer was telling
8    us when we tried to download that data. It wouldn't
9    even read it. It wouldn't even let us get to that
10   point.
11       Q   If I understand your testimony -- well,
12   your testimony is that all evidence has been
13   preserved as far as the City is concerned.
14       A   All evidence has been preserved as far as
15   the City is concerned. There was no evidence from
16   Joseph Salazar. How do I say this? Even if we had
17   Joseph Salazar's serial number right now, there
18   still would not be anything more in the evidence
19   room than what is sitting there right now. All
20   evidence has been preserved.
21       Q   The purpose of an officer submitting
22   evidence into the evidence room is for a criminal
23   prosecution; correct?
24       A   Chain of custody.
25       Q   And it's for a criminal prosecution;

Page 48

1    correct?
2        A   In addition to chain of custody. It's
3    held for safekeeping. It's not just criminal
4    prosecution. It's held for safekeeping. It's held
5    for chain of custody.
6        Q   Okay. Is it your testimony that Espanola
7    Police Department will put evidence into the
8    evidence locker to preserve evidence that might be
9    used against them in a future civil lawsuit?
10       A   Okay, say that again.
11       Q   Is it your testimony that one of the
12   reasons that the Espanola Police Department will
13   save evidence in the evidence room is to preserve
14   evidence that may be used against the City in a
15   future civil lawsuit?
16           MR. ESQUIVEL: Object to the form of the
17   question.
18       A   It's there -- they preserve evidence used
19   at a scene regardless of what it's going to be used
20   for. They need to keep a copy -- they need to keep
21   chain of custody of whatever the evidence might be.
22       Q   And the chain of custody is so when you go
23   and you prosecute a criminal defendant, that the
24   evidence that is presented in court can be shown to
25   be authentic, and hasn't been tampered with;

Page 49

1    correct?
2        A   That is one of the reasons for. It's not
3    solely for criminal. It's for safekeeping.
4        Q   What else would chain of custody --
5        A   Well, what I mean is, in the evidence
6    room, it's not just held for criminal prosecution.
7    It's in addition to safekeeping, in addition to if
8    there was an individual who may be intoxicated and
9    couldn't keep his personal belongings or had money
10   or something and had to have been detoxed. It's not
11   just for criminal prosecution. It's used for
12   anything that the officer needs to preserve that
13   should not stay on their person. It's there to show
14   that he accepted the property and where he put it to
15   keep it so it wouldn't be in his possession to
16   either get lost or, you know, whatever.
17       Q   Okay. So your testimony, then, is that
18   even if the Espanola Police Department had received
19   Exhibit 2, the Espanola Police Department would have
20   done nothing else, it would not have kept any other
21   evidence or done anything differently, other than
22   copying the letter and putting it in the evidence
23   locker?
24       A   That's correct. That's correct. Had the
25   Espanola Police Department received Exhibit 2, only

Page 50

1 ==a copy would have been affixed to Greg Esparza's==
2 ==items that he tagged into evidence because the case==
3 ==numbers matched.==
4     Q  Okay. And if the Espanola Police
5 Department had received Exhibit 2, you would not
6 have gone out and tracked down Joseph Salazar's
7 Taser and somehow noted the serial number.
8     A  No, sir.
9     Q  Okay.
10     A  There was no evidence from Joseph Salazar
11 required from his Taser. Therefore, we wouldn't
12 have reached out to Joseph Salazar and his Taser to
13 try and obtain -- yeah, there's no evidence from
14 Joseph Salazar's Taser in this case, I guess is what
15 I'm getting at.
16     Q  I have no further questions.
17     A  If I may add, if I may add, the Taser
18 download has never been part of our normal duties,
19 has never been evidence, has never been utilized as
20 evidence, and even -- again, even if I did receive
21 Exhibit 2, it doesn't specifically ask me for Taser
22 download stuff, or Taser data. If it mentioned
23 anything like that -- like today's world, if I
24 received something like this that said "Taser data,"
25 I would have made the effort to go out and see, what

Page 51

1 do they mean by Taser data? So had I received this
2 letter, August 6, 2012, back then, I still wouldn't
3 have reached out to Joseph Salazar or anyone as far
4 as Taser data, because it's just something that we
5 don't do.
6     Q  Okay. So to make sure the record is clear
7 here, I want to make sure I understand. Even though
8 this letter specifically says Mr. Martinez is
9 alleging that he was tased by Espanola police
10 officers, in the plural, correct --
11     A  Correct.
12     Q  -- and that he would be filing a lawsuit;
13 correct --
14     A  Correct.
15     Q  ==-- had the police department received this==
16 ==letter, the police department would not have gone==
17 ==out to Joseph Salazar to identify the specific Taser==
18 ==issued to defendant Salazar?==
19     A  ==No. It would have just went into==
20 ==evidence.==
21     MR. COBERLY: Nothing further.
22     MR. ESQUIVEL: We'll read and sign.
23     (The deposition concluded at 12:04 p.m.)
24
25

Page 52

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF NEW MEXICO
3 JACKIE MARTINEZ, Personal
  Representative, On Behalf of the Estate
4 of RUSSELL MARTINEZ,
5     Plaintiff,
6 vs.    NO: 14-cv-00534 KG/WPL
7 JOSEPH SALAZAR, et al.,
8     Defendants.
9     REPORTER'S CERTIFICATE
10   I, MARY ABERNATHY SEAL, New Mexico CCR
#69, DO HEREBY CERTIFY that on June 3, 2016, the
11 Deposition of FRANCISCO GALVAN was taken before me
at the request of, and sealed original thereof
12 retained by:
13     Attorney for the Plaintiff
    Mr. Todd Coberly
14     COBERLY & MARTINEZ, LLLP
    1322 Paseo de Peralta
15     Santa Fe, New Mexico 87501-4325
    (505) 989-1029
16
17   I FURTHER CERTIFY that copies of this
Certificate have been mailed or delivered to all
18 Counsel, and parties to the proceedings not
represented by counsel, appearing at the taking of
19 the Deposition.
20   I FURTHER CERTIFY that examination of this
transcript and signature of the witness was required
21 by the witness and all parties present.
On_____ a letter was mailed or delivered to Mr.
22 Martin Esquivel regarding obtaining signature of the
witness, and corrections, if any, were appended to
23 the original and each copy of the Deposition.
24
25

Page 53

1   I FURTHER CERTIFY that the recoverable
cost of the original and one copy of the Deposition,
2 including exhibits, to Mr. Todd Coberly is
$_____.
3
4   I FURTHER CERTIFY that I did administer
the oath to the witness herein prior to the taking
5 of this Deposition; that I did thereafter report in
stenographic shorthand the questions and answers set
6 forth herein, and the foregoing is a true and
correct transcript of the proceeding had upon the
7 taking of this Deposition to the best of my ability.
8   I FURTHER CERTIFY that I am neither
employed by nor related to nor contracted with
9 (unless excepted by the rules) any of the parties or
attorneys in this case, and that I have no interest
10 whatsoever in the final disposition of this case in
any court.
11
12
13     _____
    Mary Abernathy Seal
14     BEAN & ASSOCIATES, INC.
    NM Certified Court Reporter #69
15     License Expires: 12/31/16
    (5659L) MAS
16 Date taken: June 3, 2016
    Proofread by: KW
17