IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JACKIE MARTINEZ, as Personal
Representative on behalf of the
Estate of Russell Martinez,

      Plaintiff,

vs.                                        Civ. No. 14-534 KG/WPL

JOSEPH SALAZAR, in his individual
capacity, GREG ESPARZA, in his
individual capacity, THE ESPANOLA
DEPARTMENT OF PUBLIC SAFETY,
LEO MONTOYA, and THE CITY OF
ESPANOLA,

      Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendant Joseph Salazar, Greg Esparza, the

Espanola Department of Public Safety, Leo Montoya, and the City of Espanola's

("Defendants'") First Motion for Partial Summary Judgment Against Plaintiff Russell Martinez

("First MSJ") and Defendants' Second Motion for Summary Judgment Against Plaintiff Russell

Martinez ("Second MSJ"), both filed on October 13, 2015.  (Docs. 112 & 113).  Plaintiff filed a

consolidated response to both motions on November 6, 2015, and Defendants filed replies on

November 20, 2015.  (Docs. 123, 132, & 133).  Having reviewed both motions, the

accompanying briefs, and relevant law, the Court DENIES Defendants' First MSJ and

Defendants' Second MSJ.

**I.**      **Plaintiff's Amended Complaint**

This is a police excessive force case arising from interactions between Russell Martinez ("Mr. Martinez") and Defendant police officers Joseph Salazar and Greg Esparza.  Mr. Martinez originally filed this case on May 5, 2014, in the First Judicial District Court, County of Rio Arriba, New Mexico.  (Doc. 1-1).  Defendants removed the case to this Court on June 6, 2014.  (Doc. 1).  Subsequently, Mr. Martinez filed his First Amended Complaint for Damages Resulting from Civil Rights Violations, Intentional Torts, Negligence, and Violations of Title II of the Americans with Disabilities Act ("Amended Complaint").[1]  (Doc. 88).

The Amended Complaint alleges four counts.  In Count I, Plaintiff brings 42 U.S.C. § 1983 excessive force claims against Defendants Salazar and Esparza.  (Doc. 88) at 5.  In Count II, Plaintiff brings New Mexico Tort Claims Act ("NMTCA") claims against Salazar and Esparza for the intentional torts of assault, battery, false arrest, and violation of the United States and New Mexico constitutions.  *Id.* at 5–6.  In addition, the Amended Complaint alleges *respondeat superior* claims against the Espanola Department of Public Safety ("EDPS") and the City of Espanola for the intentional torts allegedly committed by Salazar and Esparza.  *Id.*  In Count III, Plaintiff brings state negligence claims against Joe Montoya, the Director of the EDPS, for negligently hiring, training, and/or supervising Salazar and Esparza, and thereby causing Salazar and Esparza to commit the intentional torts listed in Count II.  *Id.* at 6–7.  The Amended Complaint also alleges that EDPS and the City of Espanola are liable for Montoya's negligent actions under *respondeat superior*.  *Id.* at 7.  Finally, in Count IV, Plaintiff asserts claims under Title II of the Americans with Disabilities Act ("ADA") against the EDPS and the

---

[1] On December 7, 2015, Plaintiff's Counsel filed a statement notifying the Court and the parties that Mr. Martinez had passed away.  (Doc. 139).  The Court then substituted Jackie Martinez ("Mrs. Martinez"), as personal representative of Mr. Martinez's estate, as the plaintiff in this case.  (Doc. 161).

City of Espanola for failing to reasonably accommodate Mr. Martinez's disability in the course of questioning, interacting with, and detaining him.  *Id*.

Defendants now move for partial summary judgment on Plaintiff's ADA claims in their First MSJ, and Plaintiff's Section 1983 claims in their Second MSJ.  Plaintiff opposes both motions in their entirety.

## II.      Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the non-movant.  *Deepwater Invs. Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir. 1991).  The movant bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact.  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant.  *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted).  The non-movant may not avoid summary judgment by resting upon the mere allegations or denials of its pleadings.  *Bacchus Indus., Inc.*, 939 F.2d at 891.

## III.     Background[2]

---

[2] Unless otherwise noted, the summary of material facts is undisputed.

At all times relevant to this lawsuit. Mr. Martinez was a paraplegic and his lower left leg was amputated.  (Doc. 123-2) at 2; (Doc. 113-1) at 5:22:10–13.  He did not wear, and had never worn, a prosthesis.  (Doc. 123-2) at 2.  Mr. Martinez was approximately 5'4" and weighed approximately 115 pounds.  (Doc. 123-3) at 134:16–20.

On May 11, 2012, Mr. Martinez and his wife went to a Sonic Drive-In Restaurant in Espanola, New Mexico, and ended up having an argument.   (Doc. 113-1) at 2:5:19–24, 3:6:2–7:10, 7:5:2–6:11.  Defendant Salazar then responded to a 911 call for a domestic disturbance at the Sonic.  *Id*. at 10:102:15–103:7.  Upon arriving, Defendant Salazar first spoke to Mrs. Martinez about the argument.  *Id*. at 10:103:8–24.  Plaintiff maintains that Mrs. Martinez told Defendant Salazar at that time that Mr. Martinez was paraplegic and that, while he was sitting in the driver's seat of their car, he was unable to drive.  (Doc. 123-4) at 12:2–15.  Defendant Salazar disputes this fact, and testifies that he was unaware of Mr. Martinez's paraplegia until the incident was over and Mr. Martinez had been handcuffed.  (Doc. 133-1) at 131:17 – 132:5.  The parties do not dispute, however, that Defendant Salazar understood that Mrs. Martinez was in possession of the car keys.  (Doc. 123-4) at 12:12–13; (Doc. 123-3) at 104:2–4.

Defendant Salazar then confronted Mr. Martinez in the vehicle.  (Doc. 123-3) at 104:25–105:22.  At this point, the facts are highly disputed.  According to Plaintiff, Defendant Salazar initiated the encounter by approaching Mr. Martinez in the car, telling Mr. Martinez that he was under arrest, and asking him to get out of the car.  (Doc. 123-1) at 16:1–12; (Doc. 123-4) at 12:21–13:3; (Doc. 123-5) at 6:1–11, 31:3–5.  Mr. Martinez maintains that he did not get out of the car because he physically could not, as a result of his paraplegia, and that he told Defendant Salazar about his condition.  (Doc. 123-1) at 9:4–10, 16:8–12; (Doc. 123-4) at 12:21–13:3.  Both Mr. and Mrs. Martinez state that, as a result, Defendant Salazar pulled Mr. Martinez from the

car, began beating him, dragged him across the asphalt, and eventually Tased him without warning.  (Doc. 123-1) at 10:3–13, 16:1 –17:1, 17:15–18, 19:17–21:7, 22:19– 23:5, 24:9–13; (Doc. 123-3) at 113:10–114:3; (Doc. 123-4) at 10:11–18, 18:25–20:7.

Defendant Salazar then asked a civilian onlooker, Mario A. Lovato, for assistance and to hold Mr. Martinez down.  (Doc. 123-1) at 30:12–17.  Mr. Lovato pinned Mr. Martinez's head to the asphalt with his knee.  *Id*.  During the scuffle, Mr. Martinez tried to defend himself from being dragged and choked, and admits to biting Mr. Lovato when Mr. Lovato pinned his head to the asphalt.  (Doc. 123-1) at 28:21–29:23, 35:1–4.  Defendant Esparza then arrived on the scene. At this time, Defendant Salazar and Mr. Lovato had pinned Mr. Martinez's head to the pavement with Mr. Lovato's knee, and that Mr. Martinez was completely subdued.  (Doc. 123-1) at 30:12– 17; (Doc. 123-7) at 66:12–67:5, 67:22–68:6.  Nevertheless, Mr. Martinez maintains that Defendant Esparza then shot him with a Taser without warning.  (Doc. 123-1) at 37:3–4, 38:17– 39:4.  Data provided by Defendants in response to Plaintiff's request for information regarding Defendant Esparza's Taser indicates that Defendant Esparza fired the Taser for four five-second cycles in rapid succession.  (Doc. 123-9) at 3, 4.

Defendants, on the other hand, maintain that Defendant Salazar attempted to speak to Mr. Martinez in the car to get Mr. Martinez's side of the story, but that Mr. Martinez slammed the door on him and would not exit the vehicle.  (Doc. 133-1) at 105:1–22.  Defendant Salazar testifies that Mr. Martinez then punched Defendant Salazar in the face, lunged at him, and grabbed his firearm as they fell to the ground, and a scuffle ensued.  (Doc. 133-1) at 107:20– 108:12, 108:21–25, 109:1–2, 110:1–112:25.  After Mr. Martinez continued to grab Defendant Salazar's firearm, Defendant Salazar fired his Taser at Mr. Martinez.  *Id*. at 115:8–116:20. According to Defendants, the citizen onlooker, Mr. Lovato, saw the scuffle between Mr.

Martinez and Defendant Salazar and offered his assistance, which Defendant Salazar eventually accepted. (Doc. 133-4) at 7:20–8:25. When Defendant Esparza arrived on the scene, he saw that Defendant Salazar and Mr. Martinez were in a scuffle. (Doc. 133-5) at 62:5–14. He saw Mr. Martinez punch Defendant Salazar in the chest, and attempted to assist Defendant Salazar in restraining him. *Id*. at 62:15–17. In doing so, Mr. Martinez attempted to punch Defendant Esparza in the face, and successfully punched him in the chest. *Id*. at 62:17–63:9. As a result, Defendant Esparza was unable to restrain him. *Id*. He warned Mr. Martinez that he would fire his Taser, and subsequently deployed the Taser in dart and drive-stun mode for two cycles. *Id*. Based on the incident, Defendants maintain that Defendant Salazar planned on charging Mr. Martinez with battery on a police officer and prepared a criminal complaint and statement of probable cause. (Doc. 133-1) at 129:6–24, 143:4–6, 147:11–14, 149:18–19, 150:9–11, 168:9–17. Ultimately, no criminal complaint was filed against Mr. Martinez. (Doc. 123-3) at 149:9–151:13.

The parties do not dispute that the incident left Mr. Martinez with multiple bruises, scrapes, and lacerations on his legs, torso, arms, and head. (Doc. 123-1) at 108:14–113:17, 10–17; (Doc. 123-10) at 3. The parties also agree Defendants Salazar and Esparza, and Mr. Lovato, are all approximately 5'8" and weigh between 185 and 230 pounds. (Doc. 123-3) at 134:16–20, 136:10–25; (Doc. 123-8) at 84:8–15, 84:25–85:7.

## IV.    Discussion

Defendants separately move for partial summary judgment on Plaintiff's claims under the ADA and excessive force claims under Section 1983. The Court will address each in turn.

### A.    *Defendants' First Motion for Partial Summary Judgment*

In the First MSJ, Defendants argue that the facts of this case do not implicate a claim under the ADA.  Defendants contend that the scuffle between Mr. Martinez and the officers constituted "exigent circumstances."  As a result, Defendants maintain that the ADA did not require Defendants Salazar and Esparza to accommodate Mr. Martinez's disability until they secured the scene.  Plaintiff responds that the Tenth Circuit, along with several other circuits, has not recognized an "exigent circumstances exception" to liability under the ADA.  Even if the Court were to recognize such an exception, Plaintiff maintains that it does not apply to the undisputed facts of this case.

1.  *Law Relating to Claims under the ADA*

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of such services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In the Tenth Circuit, a plaintiff must prove three factors to establish a claim under Title II: (i) that he or she is a qualified individual with a disability; (ii) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or the public entity otherwise discriminated against the plaintiff; and (iii) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  *Trujillo v. Rio Arriba Cty.*, No. CIV 15-0901 JB/WPL, 2016 WL 4035340, at *8 (D.N.M. June 15, 2016) (citing *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999)).

The Tenth Circuit has held that a plaintiff may state a claim under Title II of the ADA based on police conduct in an arrest or investigation.  *Twitchell v. Hutton*, No. 10-CV-01939-WYD-KMT, 2011 WL 318827, at *10 (D. Colo. Jan. 28, 2011) (citing *Gohier*, 186 F.3d at 1220–21).  In *Gohier v. Enright*, the Tenth Circuit discussed Title II claims arising from arrests

7

under two different theories.  186 F.3d at 1220.  First the Court discussed claims in which the police wrongly arrested an individual with a disability because the police misperceived the effects of that disability as criminal activity.  *Id*. (citing *Lewis v. Truitt*, 960 F. Supp. 175, 176–77 (S.D. Ind. 1997); *Jackson v. Town of Sanford*, No. 94–12–P–H, 1994 WL 589617, at *1 (D. Me. Sept. 23, 1994)).  Second, the Court stated that a plaintiff may also recover where police properly investigated and arrested a person with a disability for a crime unrelated to that disability, but failed to accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.  *Id*. at 1220–21 (citing *Gorman v. Bartch,* 152 F.3d 907, 912–13 (8th Cir. 1998)).  While the *Gohier* Court did not formally adopt either or both the "wrongful arrest" theory and the "reasonable accommodation" theory, it held that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law."  *Id*. at 1221.

        In addressing ADA claims, the Fifth Circuit has held "that Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."  *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir.)  In doing so, the Fifth Circuit reasoned that law enforcement personnel are often dealing with unexpected and rapidly developing situations.  *Id*.  Thus, "[t]o require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents."  *Id*.

        In *Hainze*, law enforcement responded to a 911 call reporting a mentally-ill man, who was under the influence of alcohol and anti-depressants, carrying a knife, and threatening to

8

commit suicide or suicide by cop. *Id*. at 797. When police confronted the man, who was holding

a knife in his hand and talking to two unidentified individuals, he responded with profanities and

approached a police officer. After he ignored police orders to stop and continued to walk

towards the officer, the officer fired two shots into his chest. *Id*. Based on the reasoning stated

above, the *Hainze* Court held that the plaintiff's ADA claim was not available under such

circumstances, and that the officers were under no duty to reasonably accommodate the man's

disability until the area was secure and there was no threat to human safety. *Id*. at 801–02.

Other courts which have applied the *Hainze* Court's reasoning to dismiss ADA claims

have done so in similar circumstances. These circumstances include confrontations with

individuals who seemed mentally unstable and unpredictable, were in possession of a weapon,

had resisted arrests or failed to obey police orders, and exhibited aggressive and irrational

behavior, which had created concern for public safety and officer well-being. *See e.g. De Boise

v. Taser Int'l, Inc.*, 760 F.3d 892, 898–99 (8th Cir. 2014), *cert. denied sub nom. De Boise v. St.

Louis Cty., Mo.*, 135 S. Ct. 2348, 192 L. Ed. 2d 143 (2015) (holding that exigent circumstances

exception applied where officers received information that man assaulted his mother, and

observed aggressive, irrational behavior and continued non-compliance with their demands);

*Bahl v. Cty. of Ramsey*, 695 F.3d 778, 785–86 (8th Cir. 2012) (finding that exigent circumstances

existed where police observed man drive through red light during rush hour traffic, creating

overriding public safety concerns); *Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1305–06 (D. Kan.

2005) (applying exception where police responded to disturbance where individual had knife, ran

from officers, refused to comply with demands, and lunged at officer from five feet with knife).

On the other hand, several courts have declined to apply the "exigent circumstances

exception" to ADA claims. Instead, those courts reason that any exigency involved in a disabled

plaintiff's interaction with law enforcement can be properly considered in terms of "reasonableness" under the ADA. *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1085–86 (11th Cir. 2007); *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 174–75 (4th Cir. 2009); *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231–32 (9th Cir.), *cert. granted sub nom. City & Cty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 702, 190 L. Ed. 2d 434 (2014), and *rev'd in part, cert. dismissed in part sub nom. City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015). It remains an open question whether the Tenth Circuit would apply the blanket exception as articulated in *Hainze*, or incorporate that inquiry into the question of reasonableness. It is important to note again, however, that the Tenth Circuit has clarified that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law." *Gohier*, 186 F.3d at 1221, *cited in Sheehan*, 743 F.3d at 1233 (including *Gohier* in cases declining to adopt Fifth Circuit's approach to ADA claims).

## 2.   *Whether the "Exigent Circumstances Exception" Applies*

Defendants argue that the facts presented here fall within the "exigent circumstances exception," as articulated by the *Hainze* Court, and, therefore, the ADA does not apply to Defendants Salazar and Esparza's conduct. Specifically, under this exception, Defendants contend that the ADA does not apply to Defendants Salazar and Esparza's conduct until such time as the scene was secured. Defendants maintain that the scene was not secured until Mr. Martinez was apprehended and handcuffed, and that Plaintiff does not create any genuine dispute of material fact as to whether Defendants failed to accommodate Mr. Martinez's disability at that time. As a result, Defendants claim they are entitled to summary judgment on Plaintiff's claims under the ADA.

Despite Defendants' contentions, it is clear that the Tenth Circuit has not affirmatively adopted the "exigent circumstances exception."   The Tenth Circuit *has* held that a plaintiff may state a claim under Title II of the ADA based on police conduct in an arrest or investigation. *Gohier*, 186 F.3d at 1220.  In addition, the Tenth Circuit has discussed doing so under the "wrongful arrest" and "reasonable accommodation" theories, as explained above.  *Id*. at 1220–21.  Even so, it does not necessarily follow that the Tenth Circuit would adopt the Fifth Circuit's reasoning in *Hainze*.  Indeed, other circuits applying the "wrongful arrest" and "failure to accommodate" theories to ADA claims have declined to do so.  *See Waller*, 556 F.3d at 174–75; *Sheehan*, 743 F.3d at 1231–32.

Even if the Tenth Circuit were to adopt the "exigent circumstances exception" to ADA liability, however, the Court finds that such an exception would not apply to the facts of this case.  Indeed, courts that have applied the exception have done so where law enforcement confronted mentally-ill individuals who were exhibiting unpredictable or irrational behavior, acting aggressively and threatening to hurt themselves or other people, brandishing weapons such as guns or knives, or driving cars through red lights in traffic.  *Cf. Hainze*,  207 F.3d at 797, 801–02; *De Boise*, 760 F.3d at 898–99; *Bahl*, 695 F.3d at 785–86; *Sudac*, 378 F. Supp. 2d at 1305–06.  These are simply not the circumstances here.  Although Defendant Salazar initially responded to a call reporting a domestic disturbance, there are no allegations that Mr. Martinez was reported as especially violent or unstable.  Further, Mr. Martinez was not in possession of any type of weapon, and Defendant Salazar does not purport to have believed Mr. Martinez had a weapon.  It is also undisputed that, prior to approaching Mr. Martinez, Defendant Salazar understood that he was not in possession of the car keys.  By sitting in a car with no means of driving it and with no weapons, Mr. Martinez's behavior did not implicate the potentially life-

11

threatening situations and public safety concerns emphasized by the *Hainze* Court, even if Defendant Salazar was completely unaware of Mr. Martinez's paraplegia. 207 F.3d at 801.

Indeed, the parties strongly dispute the facts surrounding the scuffle between Mr. Martinez and Defendant Salazar, and the extent of Mr. Martinez's initial aggression towards Defendant Salazar. However, the jury may properly consider the relevance of this information and weigh the parties' conflicting accounts in the context of the reasonableness inquiry under the ADA. This information could certainly be relevant to the question of whether Defendant Salazar failed to accommodate Mr. Martinez and his physical disability.

As a result, even if the Tenth Circuit were to adopt the "exigent circumstances exception" to ADA liability for police conduct in an arrest or investigation, the facts viewed in the light most favorable to Defendants do not fall within this exception. Therefore, Defendants' First MSJ will be DENIED.

### B. *Defendants' Second Motion for Summary Judgment*

In Defendant's Second MSJ, they argue that Plaintiff's excessive force claims under Section 1983 should be partially dismissed. Specifically, Defendants argue that, to the extent Plaintiff alleges that Defendants Salazar and Esparza violated Mr. Martinez's constitutional rights by failing to accommodate his disability, that claim should be dismissed. As grounds, Defendants contend that Defendants Salazar and Esparza are entitled to qualified immunity because, at the time of the incident, it was not clearly established that they could violate Mr. Martinez's constitutional rights by failing to accommodate his disability. Plaintiff responds that the facts as alleged in the Amended Complaint plausibly state a claim for excessive force, and that the claim does not depend on Mr. Martinez's disability. In their reply brief, Defendants further argue that Plaintiff has not shown that Defendants Salazar and Esparza's use of a Taser to

subdue Mr. Martinez when he was actively resisting the officers violated a clearly established constitutional right.

### 1.   *The Fourth Amendment's Protection Against Excessive Force*

The issue in Fourth Amendment excessive force cases is whether, under the totality of the circumstances, an officer's use of force was objectively reasonable.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This test involves viewing the reasonableness of an officer's use of force from an "on-scene" perspective.  *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  Factors to consider in determining if use of force was excessive include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*. (quoting *Graham*, 490 U.S. at 396).

### 2.   *Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Where a defendant raises the defense of qualified immunity in a motion to dismiss, the court must determine whether the plaintiff has sufficiently alleged that: (1) the defendant's actions violated her constitutional or statutory rights; and (2) whether that right was clearly established at the time of the alleged misconduct.  *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). Thus, a court may consider either prong of the qualified immunity analysis.  *See Pearson*, 555 U.S. at 236.

13

3.   *Whether Defendants are Entitled to Qualified Immunity on Plaintiff's Section 1983 Claim for Excessive Force*

Defendants first argue that, at the time of the encounter, it was not clearly established that Defendants Salazar and Esparza violated Plaintiff's rights under the Fourth Amendment for failing to accommodate Mr. Martinez's disability.  In support, Defendants cite to *City & Cty. of San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015), and *J.H. ex rel. J.P. v. Bernalillo Cty.*, No. CIV. 12-0128 JB/LAM, 2014 WL 3421037 (D.N.M. July 8, 2014).  Defendants argue it was not clearly established that a police officer could violate a plaintiff's Fourth Amendment right by failing to accommodate his disability and, therefore, that they are entitled to qualified immunity.

The Court has already addressed this exact argument in the context of Defendant's Motion to Dismiss for Failure to State a Claim and Memorandum of Law in Support ("Motion to Dismiss").  (Doc. 93).  In its Memorandum Opinion and Order on the Motion to Dismiss, the Court held that Plaintiff's Section 1983 claim does not hinge on whether Defendants Salazar and Esparza failed to accommodate Mr. Martinez's disability.  (Doc. 208) at 12.  As a result, the Court found no basis to partially dismiss Plaintiff's excessive force claims on these grounds. Because Defendants provide no additional law or theories for this argument in their Second MSJ, the Court will not revisit its previous ruling.

Second, Defendants further argue, for the first time in their reply brief, that Defendants are also entitled to qualified immunity on Plaintiff's excessive force claims.  (Doc. 122) at 9. Specifically, Defendant maintains that, under *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015), Plaintiff cannot simply rely on a *Graham v. Connor* analysis of whether Defendants' use of force was reasonable in order to show that they violated a clearly established constitutional right.  Rather, Plaintiff must provide Tenth Circuit case law which clearly establishes that a defendant's use of force violated a constitutional right where the arrested

14

individual physically resisted officers throughout the encounter until he was finally secured.  The Court will consider Defendants' qualified immunity defense with regard to each defendant officer separately.

### a.  Plaintiff's Claims as to Defendant Salazar
#### i.     Constitutional Violation

Again, in determining whether Defendant Salazar's use of force was objectively reasonable under the Fourth Amendment, the Court considers three factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).

First, it is unclear which crime formed the basis of Defendant Salazar's initial detention and investigation of Mr. Martinez, if any.  Defendant Salazar responded to a 911 call for a domestic disturbance after Mr. and Mrs. Martinez had an argument in the Sonic parking lot. (Doc. 113-1) at 2:5:19–24, 3:6:2–7:10, 7:5:2–6:11, 10:102:15–103:7.  Defendant Salazar states that, upon arriving at the scene, he could have arrested Mr. Martinez for battery on a household member, had he reason to believe that Mr. Martinez struck Mrs. Martinez.  (Doc. 133-1) at 129:1–5.  Battery on a household member is a misdemeanor under New Mexico Law.  NMSA 1978, § 30-3-15(B) (Cum. Supp. 1999).  However, Defendant Salazar also testified that he did not "believe that [Mr. Martinez] had struck her or anything like that." (Doc. 123-3) at 105:10–14. As a result, in viewing the facts in the light most favorable to Plaintiff, Mr. Martinez's conduct may not have amounted to any crime at all, in which case the first factor tips in Plaintiff's favor. *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993) (holding that first factor

weighed in plaintiff's favor where plaintiff was initially stopped by the police for the misdemeanor of disturbing the peace).

Second, it is quite difficult to maintain that Mr. Martinez posed any type of immediate threat to Defendant Salazar or the public.  It is undisputed that, when Defendant Salazar approached him, he was sitting alone in a car.  There is no showing that Mr. Martinez possessed a weapon.  Mr. Martinez also was smaller than both Defendant Salazar and Mr. Lovato at 5'4" and 115 pounds, while they are each 5'8" and at least 185 pounds.  (Doc. 123-3) at 134:16–20, 136:10–25.  In addition, it is undisputed that Mr. Martinez was paraplegic and could not drive, and Mrs. Martinez maintains that she told Defendant Salazar as much.  (Doc. 123-4) at 12:2–15.  Moreover, Defendant Salazar admits he knew Mrs. Martinez was in possession of the keys to the vehicle.  *Id*.; (Doc. 123-3) at 104:2–4.

As to the third factor, it is well-settled that "the Fourth Amendment recognizes the right of the police, in making an arrest or stop, 'to use some degree of physical coercion or threat thereof to effect it.'"  *Hinton*, 997 F.2d at 781 (citing *Graham*, 490 U.S. at 396)).  Here, taking the facts in the light most favorable to Plaintiff, when Defendant Salazar initiated the use of force, Mr. Martinez was neither actively resisting arrest nor attempting to evade arrest by flight. Mr. Martinez was physically incapable of evading arrest by flight, as it is undisputed that he is paraplegic, does not have the use of his legs, and his lower left leg is amputated.  (Doc. 123-2) at 2; (Doc. 113-1) at 5:22:10–13.  It is Plaintiff's position that Mr. Martinez's condition rendered him unable to walk or crawl, and that if left on the ground, he would be unable to move.  (Doc. 123-1) at 29:11–16.  In addition, it does not appear that Mr. Martinez was actively resisting arrest at the time of Defendant Salazar's use of force.  According to Mr. Martinez, Defendant Salazar initiated the encounter by approaching him in the car, telling him he was under arrest,

and asking him to get out of the car.  (Doc. 123-1) at 16:1–12; (Doc. 123-4) at 12:21–13:3; (Doc. 123-5) at 6:1–11, 31:3–5.  Mr. Martinez maintains that he did not get out of the car because he could not, as a result of his paraplegia, and that he told Defendant Salazar about his condition.  (Doc. 123-1) at 9:4 – 10, 16:8 – 12; (Doc. 123-4) at 12:21–13:3.  Both Mr. and Mrs. Martinez state that, at that point, Defendant Salazar pulled Mr. Martinez from the car, began beating him on the pavement, and eventually Tased him without warning.  (Doc. 123-1) at 10:3–13, 16:1 – 17:1, 17:15–18, 19:17–21:7, 22:19– 23:5, 24:9–13; (Doc. 123-3) at 113:10–114:3; (Doc. 123-4) at 10:11–18, 18:25–20:7.

To the extent Mr. Martinez's failure to exit the car constitutes non-compliance with Defendant Salazar's orders, it cannot constitute active resistance.  Indeed, Mr. Martinez did not exit the car because he physically could not, and claims that he told Defendant Salazar as much.  *See Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1145–46 (W.D. Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008) ("Involuntary actions cannot form the basis of active resistance.") (citing *Winterrowd v. Nelson,* 480 F.3d 1181, 1186 (9th Cir. 2007)).  The Tenth Circuit has denied qualified immunity in cases with higher levels of resistance.  *See Casey*, 509 F.3d at 1280, 1282 (finding that by breaking out of officer's arm-hold in order to return file to courthouse where it belonged did not constitute attempt to evade scene).

Defendants contend that it is undisputed that Mr. Martinez "physically resisted officers throughout the encounter until he was finally secured."  (Doc. 133) at 9.  Defendants do not cite any evidentiary support for this statement, and the Court does not agree with Defendants' characterization of the undisputed facts.  According to Plaintiff, although Mr. Martinez was unable to exit his vehicle due to his disability, Defendant Salazar proceeded to punch Mr. Martinez in the face and drag him out of the car on to the pavement.  (Doc. 123-1) at 10:3–13,

17

16:1 –17:1, 17:15–18, 19:17–21:7, 22:19– 23:5, 24:9–13; (Doc. 123-3) at 113:10–114:3; (Doc. 123-4) at 10:11–18, 18:25–20:7.  Plaintiff alleges that Defendant Salazar dragged Mr. Martinez across the asphalt, choking, kicking, and punching him, and then Tasing him.  *Id.*  An onlooker, Mario Lovato, helped Defendant Salazar pin Mr. Martinez to the ground, after which Defendant Esparza arrived on the scene.  (Doc. 123-1) at 30:12–17.

Plaintiff does concede that Mr. Martinez bit Mr. Lovato as Mr. Lovato pinned his head to the asphalt.  *Id.* at 28:21 – 29:23, 35:1–4.  Plaintiff contends that Mr. Martinez did so in his own defense.  *Id*.  However, this does not affect the Court's analysis.  First, the particular circumstances surrounding the bite are unclear and remain in dispute.  Second, the bite certainly did not precipitate Defendant Salazar's initial use of force, and, according to Mr. Lovato, appears to have occurred after Defendant Salazar first Tased Mr. Martinez.  (Doc. 133-4) at 8:22–9:8. The fact that Mr. Martinez bit someone in defense after being beaten and Tased does not render Defendant Salazar's initial and unprovoked use of force reasonable as a matter of law.  *Cf. Hinton*, 997 F.2d at 780–82 (finding that third factor weighed in defendant's favor where plaintiff refused to talk with police officers when they requested him to stop and shoved officer after officer told plaintiff to calm down and go home) *and Dixon v. Richer*, 922 F.2d 1456, 1462–63 (10th Cir. 1991) (holding that police officer's aggressive frisk of plaintiff was not excessive force where plaintiff's conduct in turning around and swearing at officer could reasonably have been interpreted as resistance).

The facts surrounding the encounter are highly disputed.  According to Defendants, Mr. Martinez punched Defendant Salazar in the face, lunged at him, and grabbed his firearm as they fell to the ground.  (Doc. 133-1) at 107:20–108:12, 108:21–25, 109:1–2, 110:1–112:25.  Only then did Defendant Salazar fire his Taser at Mr. Martinez and accept Mr. Lovato's assistance.

*Id.* at 115:8–116:20; (Doc. 133-4) at 7:20–8:25.  However, at the summary judgment stage, the Court views the facts in the light most favorable to Plaintiff, generally meaning that the Court "accept[s] the facts as the plaintiff alleges them . . . ."  *Riggins*, 572 F.3d at 1107.  Where the only evidence that contradicts the plaintiff's version of the facts is another witness' testimony, the question becomes one of reconciling inconsistent testimony or assessing credibility, which is a determination left to the jury.  *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1297 (10th Cir. 2001) ("The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely within the province of the jury.").

For the foregoing reasons, the Court cannot find that Defendant Salazar's conduct was objectively reasonable as a matter of law.

### ii.        Clearly Established Law

Plaintiff must also demonstrate that Defendant Salazar's use of force violated "clearly established law."  *Riggins*, 572 F.3d at 1107.  In determining whether a defendant's actions violated "clearly established law," a court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Casey*, 509 F.3d at 1283–84.  In doing so, the United States Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Sheehan*, 135 S. Ct. 1775–76. That is, *Graham*'s general proposition that uses of force that are objectively unreasonable are unconstitutional is "not enough to turn *all* uses of excessive force into violations of clearly established law."  *Casey*, 509 F.3d at 1284 (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *See Sheehan*, 135 S. Ct. at 1775–76.

Generally, this means "that for a rule to be clearly established 'there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other

courts must have found the law to be as the plaintiff maintains.'"  *Casey*, 509 F.3d at 1284

(citing *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  However, in

the context of excessive force claims, which require "an all-things-considered inquiry with

'careful attention to the facts and circumstances of each particular case,' [ ] there will almost

never be a previously published opinion involving exactly the same circumstances."  *Id*. at 1284

(citing *Graham*, 490 U.S. at 396).  As a result, the Tenth Circuit considers the "factual

similarities of excessive force claims on a sliding scale: the more obviously egregious the

conduct in light of prevailing constitutional principles, the less specificity is required from prior

case law to clearly establish the violation."  *Ornelas v. Lovewell*, 613 F. App'x 718, 721 (10th

Cir. 2015) (internal citations and quotations omitted).

     Here, Plaintiff presents no case, and the Court has found none, in which a citizen, who

wasn't necessarily suspected of a crime, was unable to comply with police officer orders to exit a

vehicle due to his paraplegia, and was then pulled out of the vehicle, knocked to the ground,

beaten, and Tasered.  However, there need not be a case involving the exact same facts to say

that no reasonable officer could believe that he was entitled to behave as Defendant Salazar did.

*Casey*, 590 F.3d at 1285.   Indeed, Tenth Circuit case law in place at the time of the incident

clearly forbade the degree of force used by Defendant Salazar.  For example, in *Casey* the police

tackled, beat, Tasered, and knocked to the ground an individual who had peacefully attempted to

return to a courthouse with a file he should not have left with.  *Id*. at 1279–81.  There, the Court

noted that the individual was suspected of a non-violent misdemeanor, did not possess a weapon

or seem to pose any other threat, and, while he did not follow initial police orders, was not

resisting arrest or attempting to flee.  *Id*. at 1281–82.  Even without a case presenting these exact

circumstances, the *Casey* Court held that a reasonable officer could not have found a legitimate

justification for the defendant officer's conduct, and that the defendant officer was not entitled to qualified immunity. *Id*. at 1285.

In *Morris v. Noe*, police responded to a domestic disturbance at a residence. 672 F.3d 1185, 1189 (10th Cir. 2012).[3] William Morris arrived on the scene after the police had secured it, and spoke with other individuals at the residence. When another man approached him, Morris put his hands up and backed up towards the police officers, who then lunged towards Morris and forcefully took him to the ground. There, in assessing whether the officers had used excessive force under the *Graham* factors, the Court first assumed that police officers had probable cause to arrest Morris for assault, which is a misdemeanor. *Id*. at 1195. Second, Morris reacted to a potentially confrontational situation and backed up into the officers, carrying no weapons and making no overt threats, and thus posing little immediate threat to the safety of the officers. *Id*. at 1196. Third, Morris was neither resisting arrest nor attempting to flee, since he was actually backing up into the officers, and not struggling with the officers before or after they took him to the ground. *Id*. As a result, the Court found that the officers had violated Morris' constitutional rights to be free from excessive force. *Id*. The *Morris* Court further concluded that, because the officers had reason to believe Morris was, at most, a misdemeanant, and because Morris posed no threat and did not resist arrest or flee, Morris' right to be free from a forceful takedown was clearly established. *Id*. at 1198. Thus, the officer was not entitled to qualified immunity. *Id*.

Similarly to *Casey* and *Morris*, and viewing the evidence in a light favorable to Plaintiff, a reasonable jury could find that Mr. Martinez suffered an unprovoked attack that escalated to the point of him being dragged on asphalt and Tased, as described above. Given *Graham*'s general principle "that force is least justified against nonviolent misdemeanants who do not flee

---

[3] *Morris* was decided on February 27, 2012, and was therefore published law before May 11, 2012, the date of the incident in question. 672 F.3d at 1185.

or actively resist arrest," as emphasized by *Casey* and *Morris*, a jury could find Defendant

Salazar's use of force in these circumstances was unlawful.   *Casey*, 509 F.3d at 1285 (citing

*Graham*, 490 U.S. at 396).  Accordingly, Defendant Salazar is not entitled to qualified immunity.

### b.  *Plaintiff's Claims as to Defendant Esparza*

#### i.     *Constitutional Violation*

Plaintiff also challenges Defendant Esparza's use of force upon arriving at the scene.

According to Plaintiff, by the time Defendant Esparza arrived, Defendant Salazar and the civilian

onlooker, Mr. Lovato, had pinned Mr. Martinez's head to the pavement with Mr. Lovato's knee.

(Doc. 123-1) at 30:12–17.  In addition, Mr. Lovato testified that he and Defendant Salazar had

subdued Mr. Martinez by the time Defendant Esparza arrived to assist Defendant Salazar.  (Doc.

123-7) at 66:12–67:5, 67:22–68:6.  Nevertheless, Mr. Martinez maintains that Defendant Esparza

then shot him with a Taser without warning.  (Doc. 123-1) at 37:3–4, 38:17–39:4.  Data provided

in response to Plaintiff's request for information regarding Defendant Esparza's Taser indicates

that Defendant Esparza fired the Taser for four five-second cycles in rapid succession.  (Doc.

123-9) at 3, 4.

Applying the *Graham* test to the circumstances as they relate to Defendant Esparza's

conduct, Defendant Esparza's conduct cannot be justified by the severity of the crime at issue, by

any threat to the safety of the officers or others, or by active resistance to arrest or an attempt to

evade arrest by flight.  Indeed, taking the facts in the light most favorable to Plaintiff, Mr.

Martinez's crime was not severe, Mr. Martinez had already been subdued and was being held by

Defendant Salazar and Mr. Lovato, and, as a result, was not resisting arrest.  In addition, Mr.

Martinez physically could not flee the scene, as he does not have the use of his legs.  Despite

this, Defendant Esparza fired his Taser at Mr. Martinez four times in rapid succession without

22

any warning.  The Tenth Circuit has held that an officer used an excessive amount of force by Tasering a suspect in similar circumstances.  *See Casey*, 509 F.3d at 1285 (internal quotations and citations omitted) (holding that officer used excessive force when she arrive on scene and immediately Tased man who was not suspected of severe crime, was not threatening, and was not fleeing scene).  In addition, "[t]he absence of any warning—or facts making clear that no warning was necessary—makes the circumstances of this case especially troubling.  *Id*.  Plaintiff maintains that Defendant Esparza gave Mr. Martinez no opportunity to comply with his orders before firing the Taser four times, and "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance."  *Id*. at 1286.

Again, Defendants present a vastly different version of events, and characterize Mr. Martinez's behavior as violent and aggressive throughout the entire encounter.  However, the Court views Plaintiff's version of events to be true, absent any evidence in the record that "utterly discredit[s]" Plaintiff's version so "that no reasonable jury could have believed [her]." *Rhoads v. Miller*, 352 F. App'x 289, 291 (10th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007)).  The only evidence countering Plaintiff's version of the events here is the testimony of Defendant Salazar, Defendant Esparza, and Defendant Lovato.

The Court does note that Plaintiff concedes that Mr. Martinez bit Mr. Lovato in the course of the takedown, although the timing and circumstances surrounding the bite are unclear, as described above.  (Doc. 123-1) at 28:21 – 29:23, 35:1–4.  In any event, the bite does not appear to have precipitated Defendant Esparza's use of the Taser.  (Doc. 133-4) at 8:22–9:8. Additionally, given the questions regarding its timing, it certainly does not render Defendant Esparza's actions objectively reasonable as a matter of law.

For the foregoing reasons, the Court cannot find that Defendant Esparza's conduct was objectively reasonable as a matter of law.

<em>ii.     Clearly Established Law</em>

Again, in order to overcome the defense of qualified immunity, Plaintiff must also show that Defendant Esparza's use of force violated "clearly established law." *Casey*, 509 F.3d at 1286.  Here, Plaintiff argues that *Casey* is on point, and held that an officer was not entitled to qualified immunity where she immediately fired her Taser at a suspect who was not suspected of a severe crime, did not pose any immediate threat, and was not resisting arrest or fleeing the scene.  *Id*. at 1285–86.  In that case, similar to the facts presented here, the officer fired her Taser at the suspect immediately upon arriving at the scene, without warning, and without giving the suspect any opportunity to comply with her orders before doing so.  *Id*.  The *Casey* Court held that, in light of the *Graham* factors, there were "'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did."  *Id*. at 1286.  As a result, the Court found that the officer had violated clearly established law, and was not entitled to qualified immunity.  *Id*.

This Court agrees that Defendant Esparza's conduct, as analyzed under the *Graham* factors and in light of the Tenth Circuit's decision in *Casey*, was a violation of clearly established law.  Accordingly, Defendant Salazar is not entitled to qualified immunity.

In conclusion, because of the many factual disputes in this case, the Court cannot find, as a matter of law, that Defendants Salazar and Esparza did not violate Mr. Martinez's clearly established constitutional right to be free from excessive force.  Accordingly, the Court finds that neither defendant is entitled to qualified immunity, and that Defendant's Second MSJ should be DENIED.

**V.      Conclusion**

In light of the foregoing, IT IS THEREFORE ORDERED that:

    (1) Defendants' First Motion for Partial Summary Judgment Against Plaintiff Russell

        Martinez, (Doc. 112), is DENIED; and

    (2) Defendants' Second Motion for Summary Judgment Against Plaintiff Russell

        Martinez, (Doc. 113), is DENIED.

                                        UNITED STATES DISTRICT JUDGE